## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMIR ISBELL, *et al.*, | : | CIVIL NO. 4:12-CV-00043 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | (Magistrate Judge Schwab) |
| | : | |
| PAUL BELLINO, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## OPINION

### I.    STATEMENT OF FACTS AND OF THE CASE.

#### A. Procedural History.

Presently before the Court for judgment is the claim for compensatory damages arising from the plaintiffs' complaint (*Doc. 1*) against defendants, employees of Montour County Children and Youth Services (the "Agency")— Craig Patterson ("Patterson"), Rachel Wade ("Wade"), Julie Spencer ("Spencer")—and Montour County.   The Court conducted a bench trial on October 7-9, 2014.  The record is now closed, and the Court is prepared to render its judgment.  This Opinion constitutes the Court's findings of fact and conclusions of law made pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Husband and wife plaintiffs, Amir A. Isbell ("Mr. Isbell"), Bergina Brickhouse-Isbell, M.D. ("Mrs. Isbell") (collectively the "Isbells"), and minor plaintiffs, A.I. and J.B., commenced the above-captioned action pursuant to 42

U.S.C. § 1983 on January 6, 2012, alleging various claims, including procedural due process claims arising out of a child-abuse investigation and voluntary safety plan implemented by Patterson, Wade and Spencer (collectively referred to as the "Individual Defendants") and a similar claim against Montour County pursuant to *Monell v. Department of Social Servs.,* 436 U.S. 658, 691 (1978) ("*Monell*"). (*Doc. 1.*).  On September 25, 2012, the Court denied the Individual Defendants' and Montour County's motion to dismiss regarding plaintiffs' procedural due process and *Monell* claims.  Thereafter, on August 27, 2013, the Court granted plaintiffs' motion for summary judgment as to liability but found that punitive damages were unavailable against the Individual Defendants.  *Isbell v. Bellino,* 962 F. Supp. 2d 738 (M.D. Pa. 2013).  Finding that the parties had not produced in the summary-judgment record sufficient evidence or argument on the issue of actual damages from which the Court could make a determination, the matter was set for trial on the issue of compensatory damages only.  *Isbell,* 962 F. Supp. 2d at 757-58.

By order dated June 17, 2014, the case was reassigned to the undersigned, upon consent of the parties, for the purpose of conducting a bench trial on the issue of compensatory damages, *(Doc. 118),* which such trial was conducted on October 7-9, 2014.  After the trial, the parties submitted proposed findings of fact and conclusions of law on December 15, 2014. *(Doc. Nos. 149, 150).*

**B. Factual Findings.**

With respect to the remaining issue of compensatory damages in this litigation, we make the following findings of fact.[1]

The Isbells are the natural parents of A.I., and Mrs. Isbell is the natural mother of J.B.  During all relevant times to matters addressed at trial, Mrs. Isbell worked as a psychologist at a local prison and Mr. Isbell, having taken a hiatus from medical school, stayed at home to care for the children, particularly A.I. since he was an infant.  The Isbells are deeply religious.  Their family life and social activities are deeply rooted in their church and church activities.

On January 7, 2010, A.I. was admitted to Geisinger Medical Center ("Geisinger") due to increasing lethargy and dehydration.  Suspecting that A.I. had been abused, Geisinger doctors reported their suspicion to the appropriate authorities.  The next day, January 8th, the Agency received a suspected physical child abuse report concerning A.I. which was documented in a Childline Report,

_____

[1]        In making these findings of fact, we rely on the testimony elicited at the trial and the exhibits submitted by the parties. We have examined the evidence that has been made part of the record and reflected upon the credibility and reliability of the witnesses' testimony. Where testimony or a document is quoted directly, the findings of fact include a citation to the record. These citations are intended merely as a guide for the reader. Further, while some findings of fact are based solely upon the record, many are based at least in part upon the reasonable inferences drawn from the record. To the extent that any of the proposed findings of fact submitted by the parties are inconsistent with findings set forth herein, those proposed findings are rejected.

triggering an investigation of suspected child abuse that ultimately involved

Patterson, Wade and Spencer.  Wade met with the Isbells at 3 a.m. on January 8th

to discuss the incident, and, later in the day, asked them to sign a safety plan.[2]

The January 8th safety plan was handwritten and signed by the Isbells, Wade

and Ruth Brickhouse, Mrs. Isbell's mother, who agreed to supervise any contact

with J.B.  The plan prohibited both parents from any unsupervised contact with

J.B. and "inappropriate discipline on [sic] both children" by any other adult.

(Defendants' Ex. 2)[3].  The plan further provided that the door to A.I.'s hospital

room "will remain open," and contained the following typed provision:

> By signing this safety plan, I/We are assuring the safety of all children
> in our home and that we will follow the safety plan as listed above to
> ensure that the children in our care remain safe and free from harm.

*Id.*

By letters dated January 8, 2010, the Isbells, individually, were further

formally notified by the Agency of the report of suspected child abuse and of the

Agency's mandate to conduct an investigation to determine if the report was

"unfounded," "indicated," or "founded." (Exhibits 8, 9).  The letters also informed

the Isbells that neither of them were named as the alleged perpetrator at that time.

---

[2]    Due to the number of safety plans, both typed and handwritten, involved in
this matter, we will refer to each plan by the date on which it was signed.

[3]    Unless otherwise cited, since plaintiffs and defendants submitted many of
the same documents as exhibits, for ease of citation and reference, we cite only to
defendants' exhibit numbers.

Thereafter, however, on January 20, 2010, Mr. Isbell received a letter from the Agency informing him that he was now named as the alleged perpetrator of the suspected abuse of A.I.  Two days later, on January 22, 2010, felony and misdemeanor criminal charges arising from this incident were filed against Mr. Isbell, who was arraigned on January 27, 2010, and released on bail conditions that he comply with all of the Agency's guidelines and directives.

Also, on January 22, 2010, Patterson drafted a new safety plan in anticipation of A.I. returning home from the hospital.  The Isbells signed the January 22nd safety plan, which prohibited Mr. Isbell from residing in the home until further notice from the Agency.  The plan mandated no unsupervised contact with both children by the parents, required that contact between Mr. Isbell and A.I. be held at the Agency and supervised by Agency staff, and prohibited physical discipline from being used on either child.  The plan further stated that Ruth Brickhouse would provide the assurance of safety for the children, monitor that the safety plan was being followed, and supervise, at her discretion, any contact between Mr. Isbell and J.B.  A handwritten note initialed by "CP" appears on the plan between paragraphs 2 and 3 and states that "Phone calls are acceptable." The plan provided that if its provisions were not followed, "the agency will petition the Juvenile Court for emergency protective custody."  (Ex. 12).

A.I. was discharged from the hospital on January 30, 2010.  Thereafter, on February 12, 2014, an indicated finding of child abuse was made with respect to Mr. Isbell.  (Ex. 15).  As a result, the Agency proposed a new safety plan, dated February 16, 2010, which the Isbells signed.  The language and format of the February 16[4] safety plan differed from the previous plans.[4]  In connection with the signing of the February 16[4] safety plan, Patterson advised that he informed Mrs. Isbell that she had the option not to sign the plan; however, if she did not sign, the Agency would consider petitioning the juvenile court for intervention.  The plan was divided into sections marked "For: Amir Isbell Sr." and "For Berginia Brickhouse-Isbell." (Ex. 16).  Mrs. Isbell was now permitted unsupervised contact with both children and allowed to supervise contact between Mr. Isbell and J.B.  Mr. Isbell was restricted to unsupervised contact with any minor child and forbidden from being in the home when A.I. was present in the home.  The plan continued restricting Mr. Isbell from residing in the home, did not allow unsupervised contact with A.I., and only permitted contact between Mr. Isbell and A.I. to take place at the Agency with Agency staff supervising.  Physical discipline of either child was forbidden; although that mandate fell only under Mrs. Isbell's section of the plan.  And, the plan contained the warning that if its provisions were

---

[4]    On February 3, 2010, Leola Isbell, as paternal grandmother, and Spencer also signed a form titled "Safety Plan" dated February 3, 2010, containing handwritten provisions.  Leola Isbell signed as the person assuring the safety of the children and compliance with the plan. (Ex. 14).

not followed, the Agency would petition the Juvenile Court for emergency protective custody.

From approximately the end of January until February 16th, the Isbells asked many questions of the Individual Defendants regarding navigating their various social and religious activities within the confines of the safety plans.  Such questioning while aimed at clarifying the terms of the safety plans, resulted in a series of amendments and supplements to the plans.  On or about March 11, 2010, for example, Mr. Isbell was alone at the family residence when Spencer arrived there for a pre-arranged visit and observed Mr. Isbell picking up the house and preparing to grill for the family and guests who were in town for a medical procedure.  Mr. Isbell was outside grilling when Mrs. Isbell arrived home with A.I., J.B. and the guests.  Although Spencer talked with Mrs. Isbell, she did not mention her belief that Mr. Isbell's grilling outside of the home while A.I. was inside the home was a safety plan violation.  Upon leaving the home, Spencer telephoned Patterson who informed her to call the family back and tell them to have Mr. Isbell leave the home.  Upon receiving that call, Mr. Isbell left the property.

The next day, March 12, 2010, at 9:00 a.m. Supervisor Riley noted that he called Mr. Isbell "to clarify that where the safety plan states NF [Amir] may not be

present in the home when the VC child is present or reside [sic] in the home it

includes the property not just the house." (Plaintiff's Exhibit 1a, at 20).  Riley

further noted that he informed Mr. Isbell that "by violating the safety plan he is

putting his child at risk of being placed [in foster care]."  Riley's note does not

mention that he discussed with Mr. Isbell a 100-yard requirement, and Mr. Isbell

does not remember any discussion of that distance limitation.  On March 12, 2010,

however, the safety plan was amended:

> #1a. Amir can not physically be present on the property of the
> home when the victim child is on the property of the home.

> #4a. The father will not be in the same room, building or within
> one hundred yards of the victim child.

(Ex. 20).  On April 30, 2010, Patterson and Spencer met with the Isbells and

their counsel to discuss a family service plan and a revised safety plan.  This

revised safety plan, dated April 30, 2010, mirrored the February 16th safety

plan and incorporated the March 12th amendment.

On May 15, 2010, A.I. had surgery at Hershey Medical Center.  Between

May 14-19, 2010, the Isbell's left telephone messages on the Agency's answering

machine cancelling several of the scheduled visits.  The Isbells, however, did not

inform the Agency or the Individual Defendants that the cancellations were, in

part, due to A.I.'s surgery until May 19th, nor did they inform the Agency or the

Individual Defendants to which hospital they admitted A.I. for his surgery.  As a

result, although Mr. Isbell had not visited A.I. at the hospital, trust between the parties was shattered.  Patterson admitted that the April 30th safety plan, in effect at the time, did not require the Isbells to notify the Agency of A.I.'s medical procedures and the facilities at which they were performed.  Patterson further admitted that he didn't know why such a provision was not in the safety plan, stating that he "just didn't think about it and I don't think any of my team or any of us thought that we needed to include, if you were going to go to another children's hospital with this child, please notify us." (Trial Transcript, October 8, 2014, at 384).

Nevertheless, the incident provided the catalyst for the Agency to file a Petition for Dependency with the Court of Common Pleas of Montour County against the Isbells on May 27, 2010.  On June 30, 2010, the Montour County Court of Common Pleas convened a hearing on the dependency petition.  The Court did not conduct a hearing on the merits; rather, the Isbells stipulated to a temporary in-home dependency for A.I. for three to five months, after which the dependency could be withdrawn by the Agency or litigated at the request of the Agency or the Isbells.  The Court further permitted Mr. Isbell to meet Mrs. Isbell and the children at church for the purpose of attending church together.[5]  The parties also signed a

---

[5]     The Court's granting of permission for the family to attend church together was not incorporated into the June 30, 2010 safety plan.

new safety plan dated June 30, 2012, which contained the April 30th safety plan language, incorporated the March 12th amendment into the body of the main plan, and contained new language requiring all persons who care for A.I. to be fully aware of the safety plan and agree to its provisions.  The June 30th safety plan also included new language pertaining specifically to Mrs. Isbell, as follows:

1. Birginia Isbell will notify the agency in advance, within 48hrs, of <u>ANY</u> medical care appointment including any visits to any other hospital.

2. Berginia Isbell will give 72 hrs advance notice of any change of location or residence and will provide the agency with the address in order for the agency to notify and coordinate ongoing services with that county's child welfare agency or any child welfare agency that has the jurisdiction for that address.

(Ex. 24).

While the interactions between the parties may have initially been cooperative, the Isbell's justified need for clarification of the various safety plans' sometimes vague and confusing provisions, and the Agency's modifications and amendments of the plans ultimately created an unworkable situation.  Throughout, the Isbells were reminded, both in the written language of the plans, and in the verbal exchanges with the Agency, that non-compliance ran the risk of putting both children in placement.  According to Mrs. Isbell:

That's what they told us since January the 8th [e]very chance - - I  don't want to say every chance they got because I don't think that's fair.  But I think whenever they perceived we were in violation, it was mentioned,

you're putting your kids at risk of placement, they're in danger of placement.

Mr. Patterson, I remember, on April 30th, he's like, I will not hesitate to ask for a hearing to put them in placement.  And, you know, that constant threat, that's scary. . . . Again, the safety plans kept changing.

(Trial Transcript, October 7, 2014, at 71).

The Isbells perceived the various modifications to the safety plans as a constantly moving target.  Mrs. Isbell, in particular, felt that the Individual Defendants were "trying to catch [her] doing something wrong and … set something up to take [her] kids away from [her]."  (Trial Transcript, October 7, 2014 at 89).  Conversely, the Individual Defendants perceived the Isbells questions and actions as stretching the "boundaries of the safety plan," (Trial Transcript, October 8, 2014, at 336), and that the parties were on a "very, very slippery slope and [they] were sliding down it."  (Trial Transcript, October 8, 2014, at 387, 403).  Further, the Individual Defendants viewed Mr. Isbell as the perpetrator of child abuse, and would not consider allowing him to return to the family home until the criminal charges against him were resolved.

During the relevant time period, Mrs. Isbell experienced nightmares, depression, suicidal thoughts and fear, particularly related to the constant threat of her children being taken away from her and the restrictions placed on her in her role as a mother.  Such emotional distress was unrelated to the Childline Report, the pending criminal charges against her husband or any other issues occurring at

the time.   Mr. Isbell corroborated Mrs. Isbell's symptoms, stating that he "slowly watched [his] wife get broken."   (Trial Transcript, October 8, 2014, at 225).   He also stated she became depressed, despondent and suicidal.   Mr. Isbell experienced depression, nightmares and suicidal thoughts and lost his ability to trust in others all in relation to the possibility that the children would be placed in foster care.

## II.   **DISCUSSION.**

This case comes to us for the limited determination of "whether and what amount of compensatory damages should be awarded" to the plaintiffs as a result of the defendants' procedural due process violation.   *Isbell v. Bellino,* 962 F. Supp. 2d 738, 758 (M.D. Pa. 2013).   Here, the plaintiffs are claiming emotional distress damages stemming from the absence of due process in connection with the alteration of the Isbell's parental rights as a result of the safety plans entered into during the time period January 8, 2010 through June 30, 2010.   The law is settled that a court may award compensatory damages in a § 1983 civil rights action for the denial of procedural due process.   *See Carey v. Piphus,* 443 U.S. 247 (1978) ("[A] purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly, as well as to minimize the risk of mistaken deprivations of protected interests).   Such an award, however, may not be based on the "'abstract value of a constitutional right.'" *Young v. Pleasant Valley Sch. Dist.*, No. 3:07-CV-00854, 2012 WL 1827194, at *19 (M.D. Pa. May 18,

2012) *aff'd*, No. 13-3605, 2015 WL 452362 (3d Cir. Feb. 4, 2015) (quoting

*Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299, 308 (1986)).  Where

procedural due process rights have been violated, absent proof of causation and

actual injury, a plaintiff is entitled only to nominal damages.  *Carey,* 435 U.S. at

264; *see also Farrar v. Hobby,* 506 U.S. 103, 112 (1992) ("[N]o compensatory

damages may be awarded in a § 1983 suit absent proof of actual injury.").

Compensatory damages linked to an actual injury, however, are not limited

to out-of-pocket loss and monetary harm. *Pryer v. C.O. 3 Slavic,* 251 F.3d 448, 454

(3d Cir. 2001).  Emotional distress injuries, such as mental anguish and suffering,

are compensable under § 1983 provided they are supported by competent evidence.

*Chainey v. Street,* 523 F.3d 200, 216 (3d Cir. 2008).  Expert medical or

psychological testimony, or any "specific type of evidence," is not required to

establish that a plaintiff has suffered mental or emotional harm. *Bolden v. SEPTA,*

21  F.3d  29,  34-36 (3d Cir.1994); *see also Carey,* 435 U.S. at 264 n. 20

(explaining that "[a]lthough essentially subjective, genuine injury . . .  may be

evidenced by one's conduct and observed by others").

That a plaintiff suffered emotional injuries, however, does not end the

inquiry into whether he or she is entitled to an award of compensatory damages

from the defendants.  Rather, where procedures are deficient, a plaintiff is required

to establish that the distress suffered is attributable to the denial of procedural due process and not the underlying deprivation. *Carey,* 435 U.S. at 259 ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."); *see Gomes v. Wood,* 451 F.3d 1122, 1132 (10th Cir. 2006) (acknowledging the fine line drawn by *Carey* between damages arising from the liberty or property deprivation and those arising from the denial of procedural due process).

"Once the plaintiff clears [these] hurdles, the burden shifts to the defendant, who then has an opportunity to prove that the same actions would have occurred even if due process had been provided." *Burns v. PA Dep't of Corr.*, 642 F.3d 163, 181 (3d Cir. 2011) (referring to the burden shifting scheme in *Carey*); *see also Alexander v. Polk*, 750 F.2d 250, 264 (3d Cir. 1984) (upholding burden-shifting in a procedural due process case with references to *Carey* and *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977)); *McClure v. Independent School District No. 16,* 228 F. 3d 1205, 1213 (10th Cir. 2000) ("*Mt. Healthy* and *Village of Arlington Heights* make clear that once a plaintiff establishes a constitutional violation, the burden shifts to the defendant to show by a preponderance of the evidence that it would have reached the same result absent the violation."). Critical to this defense, though, is the court's ability to determine what the outcome would have been had plaintiffs been afforded their due process

rights. *Carey,* 435 U.S. at 261 n. 16 ("We presume that this determination will include consideration of the likelihood that any mitigating circumstances to which respondents can point would have swayed the initial decisionmakers."); *see also, Wallace v. Powell*, No. 3:09-CV-286, 2012 WL 5379153, at *11-12 (M.D. Pa. Oct. 31, 2012). Notwithstanding a defendant's success in this regard, "[b]ecause the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, . . . the denial of procedural due process [is] actionable for nominal damages without proof of actual injury." *Carey*, 435 U.S. at 267 (citations omitted).

Judged against these principles, we find that the plaintiffs have not met their burden of proving a nexus between J.B.'s emotional distress and the lack of procedural due process in connection with the safety plans. While we do not doubt that J.B. experienced stress throughout the relevant time period, we find that such stress was attributable to disruption in the family's life as a result of Mr. Isbell not being in the home and not to any procedural due process violations, of which there is no record evidence that she was aware. With respect to A.I., we find the evidence insufficient to support a finding that he experienced any emotional distress as a result of defendants' procedural due process violation.

15

With respect to Mr. Isbell's claim for damages, while we credit Mr. Isbell's testimony regarding his emotional distress, we find that the defendants have met their burden of establishing that he would not have prevailed, and would have been removed from the family home, even if he had been afforded due process in connection with the safety plans.  Mr. Isbell was considered by the agency as the perpetrator of child abuse and was criminally charged as a result.  No mitigating evidence was provided at trial that would compel a result other than Mr. Isbell being removed from the home.

Mrs. Isbell, however, has presented sufficient evidence that she suffered actual injuries in the nature of emotional distress as a result of being denied procedural due process safeguards in connection with the alteration of her parental rights as a result of the safety plans.  We reject the defendants' contention that Mrs. Isbell's agreement to the June 30th safety plan negates her claim for damages in that such plan was the same as the initial plan entered into in January, and thus the result with respect to her also would have been the same even if she had been provided procedural protections.  Between January 8, 2010, and June 30, 2010, there were at least six iterations of the safety plans between the parties.  And, although Mrs. Isbell never had to leave the family home, the arbitrary manner in which safety plans were revised and amended resulted in significant interference with her parental rights.  No doubt Mrs. Isbell suffered emotional distress due to

16

the health problems her child was experiencing and the charges against her husband.  Based on her testimony, we conclude that she also suffered emotional distress stemming directly from her feeling like the defendants did not deal with her fairly.  Moreover, as a consequence of the deteriorating relationship between the parties, the final safety plan dated June 30th contained more restrictions on Mrs. Isbell's parental rights that may not have been included in the plan had due process been afforded from the outset.  Thus, it is entirely conceivable that had Mrs. Isbell been provided meaningful and timely due process the interference and alteration of her parental rights would have been less severe and arbitrary and the emotional distress she suffered ameliorated.

## III.    Conclusion.

Accordingly, consistent with the findings of fact and conclusions of law set forth in this opinion, IT IS ORDERED that:

1. Nominal damages in the amount of ONE DOLLAR ($1.00) shall be paid by defendants to J.B.

2. Nominal damages in the amount of ONE DOLLAR ($1.00) shall be paid by defendants to A.I.

3. Nominal damages in the amount of ONE DOLLAR ($1.00) shall be paid by defendants to Mr. Isbell.

4. Compensatory damages in the amount of ONE HUNDRED THOUSAND

DOLLARS ($100,000) shall be paid by defendants to Mrs. Isbell.

SO ORDERED.

*/s/ Susan E Schwab*
Susan E. Schwab
United States Magistrate Judge